

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

OSMOSE, INC.,

        Plaintiff,

v.

ARCH CHEMICALS, INC.,
ARCH WOOD PROTECTION, INC.,
ARCH TREATMENT TECHNOLOGIES, INC.,
COX INDUSTRIES, INC.,
ROCKY TOP BUILDING PRODUCTS, INC., and
MADISON WOOD PRESERVERS, INC.,

        Defendants.

Civil Action No. 2:10cv108

## OPINION AND ORDER

On December 3, 2010, the court conducted a Markman hearing for the purpose of construing the three disputed claims in the patents at issue in this case. After careful consideration of the briefs submitted by the parties, the arguments advanced at the Markman hearing, and the record before the court, the court issues this Opinion and Order detailing the claim constructions adopted by the court.

### I. Factual and Procedural Background

At issue in this case is plaintiff's patent titled "Micronized Wood Preservative Formulations," patent number 7,674,481 ("'481"). Plaintiff, Osmose, Inc., ("Osmose") is a manufacturer of wood/lumber treating products. Defendants Arch Chemicals, Inc., Arch Wood Protection, Inc., Arch Treatment Technologies, Inc., Cox Industries, Inc., Rocky Top Building Products, Inc., and Madison Wood Preservers, Inc., (collectively "Arch"), compete with Osmose in the wood preservation industry.

On March 9, 2010, the same day the '481 patent was issued, Osmose filed the instant patent infringement action against defendants. Pursuant to a scheduling order, the parties timely filed claim construction briefs. After carefully reviewing such filings, the court conducted a Markman hearing at which the court heard argument regarding the three disputed claim terms.

## II. Claim Construction Procedure

It is well-settled that a determination of infringement requires a two-step analysis: "First, the court determines the scope and meaning of the patent claims asserted, and [second,] the properly construed claims are compared to the allegedly infringing device." Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (internal citations omitted). Focusing on the first step, the Federal Circuit has repeatedly instructed that "the words of a claim 'are generally given their ordinary and customary meaning,'" and that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ." Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). This provides "an objective baseline from which to begin claim interpretation" and is based on "the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." Id. at 1313. As noted by the Federal Circuit:

> It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field. The inventor's words that are used to describe the invention-the inventor's lexicography-must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology. Thus the court starts the decisionmaking process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history.

2

Id. (quoting Mulitform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998)).

To determine the meaning of disputed terms, the court must first examine the claims themselves, as it is a "'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips, 415 F.3d at 1312 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)); see Vitronics, 90 F.3d at 1582 ("[W]e look to the words of the claims themselves . . . to define the scope of the patented invention."). "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term," in part because "claim terms are normally used consistently throughout the patent." Phillips, 415 F.3d at 1314.

Notwithstanding the above, the claims "do not stand alone." Id. at 1315. Rather, because the claims "are part of 'a fully integrated written instrument'" they must be read "'in view of the specification of which they are a part.'" Id. at 1315 (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 978-79 (Fed. Cir. 1995) (en banc)). Federal statute requires that the specification describe the manner and process of making and using the patented invention, and thus, the "claims must be construed so as to be consistent with the specification . . . ." Merck & Co. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1371 (Fed. Cir. 2003); see 35 U.S.C. § 112 (indicating that the specification must describe the invention in "full, clear, concise, and exact terms"). The Federal Circuit and its predecessors have thus long emphasized the specification's important role in claim construction, noting that usually the specification "is dispositive" as it is "the single best guide to the meaning of the disputed term." Phillips, 415 F.3d at 1315 (quoting Vitronics, 90 F.3d at 1582); see Multiform Dessicants, 133 F.3d at 1478 ("The best source for

3

understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history."); Markman v. Westview Instruments, Inc., 517 U.S. 370, 389 (1996) ("[A claim] term can be defined only in a way that comports with the instrument as a whole.").

In addition to the claims and specification, the court "should also consider the patent's prosecution history, if it is in evidence." Phillips, 415 F.3d at 1317 (quoting Markman, 52 F.3d at 980). The prosecution history, part of the intrinsic record, consists of the record of the proceedings before the Patent and Trademark Office ("PTO"), including the prior art cited during the examination of the patent. Id. The prosecution history is useful as it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. (citing Vitronics, 90 F.3d at 1582-83); see Chimie v. PPG Indus., 402 F.3d 1371, 1384 (Fed. Cir. 2005) (quoting ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1580 (Fed. Cir. 1988)) ("The purpose of consulting the prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed during prosecution.'").

In addition to the intrinsic record discussed above, if necessary, the court may also examine the extrinsic record, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. Technical dictionaries may be useful to illustrate the underlying technology and "the way in which one of skill in the art might use the claim terms." Phillips, 415 F.3d at 1318. General usage dictionaries may also be consulted; however, the Federal Circuit has cautioned that a "'general-usage dictionary cannot overcome art-specific evidence of the meaning' of a claim term." Id. at 1322 (quoting Vanderlande Indus. Nederland BV v. Int'l Trade

4

Comm'n, 366 F.3d 1311, 1321 (Fed. Cir. 2004)).[1] Accordingly, "while extrinsic evidence 'can shed useful light on the relevant art,' [the Federal Circuit has] explained that it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" Id. at 1317 (quoting C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004)).

Although claims must be construed through the eyes of a person of ordinary skill in the art, "[i]n some cases, the ordinary meaning of claim language . . . may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Acumed LLC v. Stryker Corp., 483 F.3d 800, 805 (Fed. Cir. 2007) (quoting Phillips, 415 F.3d at 1314). Regardless of the sources on which a court ultimately relies to construe a claim, the court must be mindful not to rewrite the claims, nor add or subtract words from the claims, even if the motivation for doing so is altruistic. SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1339-40 (Fed. Cir. 2005); see Quantum Corp. v. Rodime, PLC, 65 F.3d 1577, 1584 (Fed. Cir. 1995) ("[I]t is well settled that no matter how great the temptations of fairness or policy making, courts do not redraft claims.").

Notwithstanding the well-developed rules governing claim interpretation discussed above, in the end, "there is no magic formula or catechism for conducting claim construction." Phillips, 415 F.3d at 1324. The Federal Circuit has recognized that resolving difficult claim construction questions is best achieved "in the context of the particular patent" as opposed to

---

[1] In Phillips, the Federal Circuit criticized the approach used in Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193 (Fed. Cir. 2002), where the specification was considered only after the court determined the "ordinary meaning" of the disputed terms. Such approach was criticized as putting "too much reliance on extrinsic sources . . . and too little on intrinsic sources, in particular the specification and prosecution history." Phillips, 415 F.3d at 1320.

5

through the application of unbending rules of construction. Id. at 1323-24. With the above principles in mind, the court addresses each disputed claim term.

### III. Disputed Claim Terms

**A. "dispersion in water"**

Osmose's proposed construction:

"a water-based liquid with un-dissolved particles throughout"

Arch's proposed construction:

"a water-based liquid with particles distributed throughout"

Construction Adopted by the Court:

"a water-based liquid with particles distributed throughout"

As is readily apparent from the above, the parties' proposed constructions are very close, with the primary dispute being over the propriety of including the word "un-dissolved" in the definition of this term. Osmose argues that the word "un-dissolved" is necessary to clarify the fact that the liquid containing the copper particles that act as the wood preserving agent is not a solution of dissolved copper particles but is instead a suspension of un-dissolved copper particles. In contrast, Arch argues that adding the word "un-dissolved" not only improperly incorporates a limitation into the claim language, but also results in the creation of ambiguity. As set forth below, although the court finds that adding the word "un-dissolved" is not appropriate in construing the word "dispersion," such finding in no way precludes Osmose from establishing that the patent claims and specification otherwise make clear that the copper particles "dispersed" throughout the water remain in solid form, measuring at least 0.001 microns.

Construing the disputed term "dispersion in water" requires consideration of the context in which such term is used throughout the '481 patent. Notably, immediately following each instance of the use of such term is the phrase "micronized particles of [one of three listed forms of copper] between [x] and [y] microns."[2] Although certain claims provided a narrower range of values for x and y, the size range of micronized copper particles at its greatest is between 0.001 microns and 25 microns.[3] Furthermore, subsequent to every occurrence of the term "dispersion in water," the claims indicate that after the wood product is treated with the water-based solution, the micronized particles of copper end up "distributed within the wood product." Accordingly, the patent claims appear to describe a process that utilizes micronized copper particles in a solid measurable form that begin within a specified size range and end up within the same size range.

The specification and the prosecution history similarly support the claimed process using micronized particles of solid copper that remain in a particulate, primarily undissolved form, within the size range indicated above. First, the specification notes in the section titled: "Detailed Description of the Invention," that a preferred metal for use as a wood preservation agent is copper, and that numerous listed forms of copper, "can be used as micronized particles having a particle size between 0.001 microns to 25 microns." '481 3:55-64. The conclusion of such paragraph, which expressly discusses micronized copper in the forms of copper carbonate, basic copper carbonate, and copper hydroxide, indicates: "These particles exhibit a relatively low

---

[2] Some, but not all, claims further indicate that the copper is "milled" to achieve the specified micronized size.

[3] The parties agreed on the construction of the term "micronized particle" to mean "a particle size in the range of about 0.001 to about 25 microns." Such construction is drawn directly from the specification and is plainly an appropriate construction of such term. According to Osmose, even at the smallest size in that range (about 0.001 microns), the micronized copper particles are ten times larger than dissolved carbon ions.

7

solubility in water." '481 3:64-65. Counsel for both Osmose and Arch confirmed at the Markman hearing that micronized copper carbonate, basic copper carbonate, and copper hydroxide, the only forms of copper expressly mentioned in the patent's claims, all have very limited solubility.[4] Specifically, counsel for Osmose stated that the three forms of copper at issue are "generally not soluble in water." (Markman Trans. at 13.) Counsel for Arch labeled such forms of copper particles as being "of limited solubility, but it's not impossible." (Id. at 47.) Counsel for both parties acknowledged the possibility that there may be "some dissolved particles" if such forms of copper are placed in water, but it is undisputed that the copper certainly will not "dissolve" as that word is commonly understood. (Id. at 15, 47.)

Second, the prosecution history indicates extensive efforts by Osmose to distinguish the instant patent's use of "generally insoluble" copper that is "micronized" and distributed throughout a water-based liquid in micronized form from the prior art that covers processes designed to dissolve copper. Considering first Osmose's filings with the PTO, Osmose repeatedly highlighted that the prior art spoke of processes designed to solubilize initially insoluble copper by using chemical agents to dissolve the copper. (Pl. Markman Brief, Ex.2 at 14 & Ex.3 at 22.) Furthermore, Osmose highlighted the fact that some of the prior art expressly states that, under such patented process, "no precipitate" of the preserving metal remains in the

---

[4] Notwithstanding the broad language in the specification regarding the potential use of numerous forms of copper and other metals as wood preservation agents, every claim in the patent appears to require the use of micronized copper carbonate, basic copper carbonate, or copper hydroxide. The court notes that the specification states that "all elements or compounds identified in this specification, unless stated otherwise, are intended to be non-limiting and representative of other elements or compounds generally considered by the those skilled in the art as being within the same family of elements or compounds." '481 3:26-30. The question of whether such statement is sufficient to extend the claim terms to forms of copper other than copper hydroxide, copper carbonate, and basic copper carbonate is not at issue in this case.

aqueous solution. (Id. Ex.2 at 14.) Considering next documents issued by the PTO, the PTO examiner recognizes that the instant invention relies on the use of particulate micronized copper as opposed to solubilized copper. Specifically, one document summarizes an interview with Osmose and notes that the applicant "pointed out that the inventive concept is the milled and micronized particle in the present method whereas the prior art teaches use in soluble form." (Id. Ex.4.) Furthermore, the examiner's "Reasons for Allowance" expressly indicates that the instant patent claims a wood preservation method that uses a "<u>copper particulate compound</u> combined with one or more organic biocides." (Id. Ex.8) (emphasis added). The examiner further indicates that the invention is a "method wherein the <u>particulate compound composition</u> is distributed <u>within</u> the wood product to render said wood product resistant to fungal decay." (Id.) (first emphasis added). The prosecution history thus supports the conclusion that the claimed invention is not a method to dissolve/solubilize copper into a solution, but is instead a method to micronize copper and to suspend such micronized particulate copper in a water-based liquid.

Notwithstanding the discussion above, the court agrees with Arch that inserting the word "un-dissolved" into the construction of "dispersion in water" is not appropriate as it may not be entirely accurate. Although all three forms of copper expressly set forth in the claims are "<u>generally</u> insoluble," nowhere does the patent teach that the claimed invention prohibits a small amount of such copper from dissolving, nor does it appear to prohibit what Arch describes as "partially" dissolved copper. What is demonstrated from the intrinsic record, including the prosecution history, is that the claimed invention is designed to utilize micronized particulate copper carbonate, basic copper carbonate, or copper hydroxide of a specified size. It is undisputed that such copper particles are not generally soluble. However, notwithstanding the fact that the patented method results in "the <u>particulate</u> compound composition [being]

9

distributed <u>within</u> the wood product," (<u>Id.</u> Ex.8) (first emphasis added), Osmose acknowledges that "some" of the copper particles "may" dissolve in the water-based solution. Accordingly, the court agrees with Arch that adding the word "undissolved" may be inaccurate and/or add ambiguity because nothing in the patent necessarily prohibits some of the copper particles from dissolving or partially dissolving.[5]

Based on the above, the court adopts the following construction of the claim term dispersion in water: "a water-based liquid with particles distributed throughout."[6] Although inclusion of the word "un-dissolved" is not warranted, such finding does not in any way limit Osmose's ability to demonstrate that its patented method primarily utilizes particulate undissolved, or partially undissolved, micronized copper.

**B. "distributed within the wood product"**

<u>Osmose's proposed construction</u>:

"micronized copper particles are spread throughout the interior of the wood product as

---

[5] Osmose unpersuasively argues that the patent specification equates "micronized" with "insoluble." First, the language cited by Osmose appears to only occur in the portion of the specification discussing specific embodiments of the patent as opposed to addressing the scope of the patent as a whole. Second, although the phrasing used in the specification indicates that when insoluble metals are used they are "micronized," the converse is not necessarily true. Stated another way, the fact that insoluble metals are micronized does not necessarily mean that all micronized metals must be insoluble. To the contrary, the specification's discussion of copper carbonate, basic copper carbonate, and copper hydroxide does not state that they are "insoluble" or "remain undissolved" but instead indicates that they exhibit "a relatively low solubility in water." Accordingly, the specification does not appear to mandate that micronized copper necessarily remain entirely "un-dissolved" when dispersed in water. That being said, Arch's counsel conceded at the Markman hearing that micronized copper particles between 0.001 and 25 microns "already are defined, and those are – those would be solid particles." (Trans. 27.)

[6] The court has reviewed and considered the extrinsic sources cited by the parties, including statements by experts; however, in light of the intrinsic record, the court does not find the extrinsic sources particularly compelling.

10

observed, for example, by visual inspection of a copper indicator applied to a cross section of the wood product"

Arch's proposed construction:

"the wood product contains micronized particles of basic copper carbonate, copper carbonate or copper hydroxide."

Construction Adopted by the Court:

"micronized copper particles penetrate and spread into the inner wood product"

The construction adopted by the court draws heavily from the parties' proposed constructions as well as the specification and prosecution history. First, the court notes that Arch has no compelling justification for use of the word "contains" in the proposed construction. Arch essentially conceded at oral argument that the word "contains" lacks the necessary specificity since the patent and prosecution history, read together, indicate that "distributed within" means that the particles must penetrate into the interior of the wood product.[7] Second, the specification expressly discusses the importance of "the penetration of the dispersion formulation into the wood's . . . cellular structure," '481 6:22-24, and that the use of copper particles in excess of 25 microns results in the surface of the wood preventing such particles from "attaining a desired penetration." '481 6:64-65. The specification clarifies that if the micronized particles are smaller than the diameter of the "border pits" in the wood product (which purportedly vary from several microns to about 30 microns) "a complete penetration and a uniform distribution of

---

[7] Arch's counsel indicated: "Distributed means spread throughout the wood in the sense that all of the wood is treated to some level of penetration inside, beyond that surface. The micronized particles . . . have penetrated into the wood over all of the treated product. [However,] distributed does not require uniform penetration throughout the interior." (Trans. 83.)

micronized preservative in [the] wood is expected." '481 6:40-43. Accordingly, the specification clearly envisions significant penetration into the interior of the wood product, with "complete" or "uniform" penetration throughout the wood being the most desirable result.

The prosecution history reveals that Osmose modified the claim language from stating "distributed in" to stating "distributed within" as the PTO examiner appeared to believe that such change was necessary to clarify that, unlike prior art that claimed a mere coating on the outside of a wood product, the patent-in-suit claimed copper penetration into the inner wood. The PTO examiner expressly noted in the "Reasons for Allowance":

> The closest prior art teaches a . . . method of manufacturing said wood by fixing a colloidal metallic compound selected from the group consisting of insoluble copper metal oxides are fixed to the wood surface with no penetration into the inner wood . . . . However, the prior art does not teach or fairly suggest the instant invention wherein the claimed method wherein the particulate compound composition is distributed within the wood product to render said wood product resistant to fungal decay.

(Pl. Markman Brief Ex.8.) Accordingly, as emphasized by the PTO examiner, it is apparent that the word "within" in the patent claims is intended to distinguish the instant invention from the prior art by requiring "penetration into the inner wood."[8]

Although the court rejects Arch's proposed use of the word "contains" to redefine the claim term "distributed within," the court does not adopt Osmose's proposed construction as it appears to be both inaccurate and confusing. First, Osmose's construction uses the word "throughout," which appears to require that micronized copper be distributed everywhere within

---

[8] Arch acknowledges in its Markman brief that "[t]o be effective, a wood preservative must (a) penetrate the wood, (b) be distributed within the wood, and (c) stay in the wood (resist leaching)." (Def. Markman Brief 4.) The patent claims, specification, and prosecution history clearly demonstrate both that the patent purports to cover an effective wood preservation method and that such method involves micronized copper penetrating the wood and being distributed within the inner wood.

12

the wood product.[9] As discussed above, complete penetration may be the preferred result of the wood treatment process, but the claim language fails to demonstrate that "uniform distribution" or "complete penetration" is a necessity. Osmose's counsel confirmed such fact by noting at the Markman hearing that "we don't mean that [the copper] needs to be in ever little, tiny crevice [in the wood.]" (Trans. 63.) Second, Osmose's proposal is confusing as it seeks to incorporate an unspecified copper indicator test as a permissible way of measuring whether the penetration is sufficient. The attempted incorporation of a copper indicator test, without setting forth either (a) the specific copper indicator necessary; or (b) the results required in order to "pass" such unspecified test, offers little, if any, clarification.

Accordingly, rather than indicate that copper must be located "throughout" the wood, and then seek to redefine "throughout" by reference to a permissive indicator test, the more appropriate definition is that contained in the prosecution history: that micronized copper particles "penetrat[e] into the inner wood."[10] A "complete penetration" and "uniform

---

[9] Both parties agree that the word "throughout" is appropriate when construing the previous claim term as such term addresses the location of particles in water. In contrast, the word "throughout" is not appropriate when referring to the final location of the copper particles inside the wood product since numerous factors, including different wood densities, the size of the cooper particles, and the size of the wood's "border pits," all impact the copper's ability to fully penetrate different portions of the wood product.

[10] As noted above, the '481 specification at times discusses "uniform distribution of copper" and "100% copper penetration," '481 9:38, 10:17, thereby demonstrating that Osmose was clearly aware of how to phrase a complete penetration requirement if it intended to do so. The fact that the actual claim terms only require that copper be "distributed within the wood product" indicates that "complete" penetration and distribution at every point "throughout" the wood product is not a requirement. That being said, after considering the entire intrinsic record, the readily apparent meaning of "distributed within" is that the copper particles must penetrate into the inner wood product as such penetration is necessary in order to effectively treat the wood. See Markman, 517 U.S. at 389 ("[A claim] term can be defined only in a way that comports with the instrument as a whole."); Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("A claim construction is persuasive, not because it follows a

distribution" is plainly ideal; however, the claim language does not set forth such limitations, and by using the more expansive word "within," only indicates a requirement that the copper penetrate into the inner wood. See Trading Techs. Int'l Inc. v. eSpeed, Inc, 595 F.3d 1340, 1352 (Fed. Cir. 2010) (recognizing that although the specification is to be consulted "to clarify the meaning of claim terms, courts must not import limitations into the claims from the specification" absent a clear indication from the patentee of an intent to require the same); (Trans. 18) (Osmose's counsel indicates: "We never put in language like uniformly distributed perfectly through the wood . . . because that isn't what happens."). Accordingly, the court adopts the following construction of the claim term distributed within the wood product: "micronized copper particles penetrate and spread into the inner wood product."

### C. "render the wood product resistant to fungal decay"

Osmose's proposed construction:

"the micronized copper particles spread throughout the interior of the wood product confer to the wood product the ability to withstand the effects of certain decay-causing fungal organisms, as determined, for example, by evaluation according to accepted industry standards"

Arch's proposed construction:

"the wood treated by this method is more resistant to fungal decay than untreated wood"

Court's proposed construction:

No Construction necessary

---

certain rule, but because it defines terms in the context of the whole patent."). The court therefore adopts the construction set forth above.

After carefully considering the parties' proposed constructions and arguments, the court finds that the instant term utilizes simple and easily understood language, with no patent-specific special meaning, making a court-adopted construction unnecessary. Notably, the dispute regarding this claim term turns entirely on the meaning of the word "resistant" and such familiar everyday term does not necessitate further clarification. See Acumed LLC, 483 F.3d at 805 (quoting Phillips, 415 F.3d at 1314) ("In some cases, the ordinary meaning of claim language . . . may be readily apparent . . . and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."); see also United States Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.").

The court rejects Arch's proposed construction, requiring only that treated wood be minutely more resistant to decay than untreated wood, as it appears to grossly minimize the meaning of the word "resistant." Although the specification discusses common testing methods in the wood preservation industry which compare treated wood to untreated wood to determine if the treated wood sufficiently resists decay, it would be a perversion of the specification to hold that any minute increase in ability to resist decay would render treated wood "resistant." On the contrary, the parties appear to agree that a person of "ordinary skill in the art" is someone within the wood preservation industry, and it is doubtful that such a person would view any minute

improvement to resisting fungal decay as rendering the wood "resistant" to such decay.[11]

The court likewise rejects the construction advanced by Osmose, which appears to both complicate the claim term at issue and unnecessarily incorporate industry standards into the definition. Osmose's proposal seeks, in part, to restate "resistant to fungal decay" as "the ability to withstand the effects of certain decay-causing fungal organisms." However, "the ability to withstand" does not appear any clearer than the word "resistant." Furthermore, the phrase "certain decay-causing organisms" further muddies the waters by begging the question: "Which organisms?"

Osmose's attempt to incorporate industry standards into the construction of the term "resistant" also does not appear appropriate. First, Osmose's proposed construction references unspecified industry standards as an "example" of what <u>might be used</u> to determine whether a process creates a sufficiently "resistant" end-product. However, by merely listing an "example," such proposed construction necessarily leaves unanswered questions regarding what will, and what will not, fall within the scope of such term. Furthermore, the proposed construction does not indicate <u>what results</u> must be achieved on the unspecified industry tests in order qualify as "resistant." Second, nothing in the intrinsic or extrinsic record suggest that the term "resistance" is necessarily limited to resistance demonstrated through commercial evaluation standards. It is generally not appropriate to limit a claimed invention to commercial embodiments when such

---

[11] The court is unpersuaded by Arch's attempt to support its proposed construction of the term "resistant to fungal decay" by reliance on the definition in the specification of the word "preservative." Such definition is applicable to an entirely different term and Arch fails to establish that by defining the word "preservative" in the specification, the patent demonstrates an effort to adopt an overly expansive meaning of the phrase "resistant to fungal decay"–the achievement of which is a central goal of the patented process.

16

limitation is not apparent from the intrinsic record.[12] Trading Techs., 595 F.3d at 1352. Accordingly, the court declines to adopt Osmose's proposed construction.

Based on the above, the court finds that neither party's proposed construction accurately defines "resistance to fungal decay." Because a review of the intrinsic record fails to demonstrate any intent to deviate from the ordinary meaning of such commonplace words, the court finds that no construction of the disputed term is necessary.

## IV. Conclusion

As discussed above, after considering the claim terms of the '481 patent, as well as the specification and prosecution history, the court issues this Opinion and Order as the court's construction of the disputed claim terms.

The Clerk is **REQUESTED** to send a copy of this Opinion to all counsel of record.

It is so **ORDERED**.

/s/ *[signature]*
Jerome B. Friedman
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
January 28, 2011

---

[12] Arch argues that including a reference to multiple evolving industry standards creates additional ambiguity as the determination of whether a competitor is infringing could change over time and/or change depending on which of several industry tests is employed. Although the court does not comment on whether the incorporation of industry standards into the claim construction is appropriate in other contexts, it is not appropriate when nothing in the patent demonstrates a clear intention to incorporate such standards from the specification. See Trading Techs., 595 F.3d at 1352 (indicating that "unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest execution or restriction . . . courts must not import limitations into the claims from the specification") (internal quotation marks and citations omitted). Accordingly, although common sense dictates that a wood product that meets industry standards would qualify as "resistant to fungal decay," the claim language does not exclude the possibility that a treated wood product that fails such commercial tests nevertheless is "resistant to fungal decay."